## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| JAMES KROENLEIN, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:12-CV-00068 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On April 23, 2009, plaintiff James Russell Kroenlein, Jr. filed applications for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et. seq.*, (Tr. 97-99), and for supplemental security income (SSI), Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of January 23, 2009.  (Tr. 100-103).[1]  After plaintiff's application was denied on initial consideration (Tr. 44-49), he requested a hearing from an Administrative Law Judge (ALJ).  See 50-51 (acknowledging request for hearing).

Plaintiff and counsel appeared for a hearing on May 18, 2010.  (Tr. 26-40).  The ALJ issued a decision denying plaintiff's application on July 30, 2010 (Tr. 10-25), and the Appeals Council denied plaintiff's request for review on December 12, 2011 (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

---

[1] The ALJ's decision states that March 6, 2009 was the date plaintiff filed his Title II and Title XVI applications. (Tr. 13). The Application Summary for Disability Insurance Benefits and Supplemental Security Income lists April 23, 2009 as the date of filing. (Tr. 97-103).

## II. Evidence Before the ALJ

### A. Disability Application Documents

In his Disability Report (Tr. 131-140), plaintiff listed his disabling conditions as a back injury, bulging discs, sacroiliac joint dysfunction, depression, panic attacks, anxiety, lower back and leg pain, and difficulty sleeping. He stated that he worked two days in 2009 and has not worked a full week since 2007. He claimed to have difficulty walking, standing, sitting, bending, and sleeping. Plaintiff listed past employment as auto body repair and delivery driver. Plaintiff reported that his medications include Ativan for panic attacks, Midol and Tylenol Arthritis for back pain, Paxil for depression and anxiety, and Wellbutrin for depression.[2] Plaintiff also indicated that he receives prolotherapy injections.[3]

In his Function Report (Tr. 166-176), plaintiff stated that he lives alone in a house owned by his parents and is able to make coffee, shower, perform limited chores, feed animals, and prepare meals. Plaintiff cares for his two children each Wednesday and every other weekend, but indicated that he needs the help of his parents in order to care for his children and pets. He does not require any special reminders in order to maintain his own personal care or to take medicine. He is able to prepare meals, drive, grocery shop, pay bills, handle a savings account, count change, and use a checkbook. Plaintiff indicated that he goes outside every day as long as he is not suffering from pain or depression. Plaintiff listed his hobbies as watching

---

[2] According to the most recent record, dated August 31, 2010, plaintiff's medications also include Xanax XR and Remeron. (Tr. 337).

[3] Prolotherapy is an orthopedic procedure used to strengthen weak joints by injecting a solution directly on the site of the torn or stretched ligament or tendon. American Association of Orthopaedic Medicine, http://www.aaomed.org/Injection-Therapy-Faqs (list visited October 22, 2012).

sports and reading and noted that he can no longer play golf. He visits with friends and goes out to eat a couple of times a week. Plaintiff reported that he does not have any problems getting along with others. Plaintiff claimed that his alleged disabilities affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. Plaintiff further reported that he has trouble handling stress when in pain and avoids physical activities for fear of hurting his back.

In the Third Party Function Report (Tr. 149-157), plaintiff's mother, Margaret Kroenlein, reported that she lives next door to plaintiff and is with him "almost all the time" because he "can't manage himself." However, Ms. Kroenlein indicated that plaintiff makes food daily, and generally has no problem taking care of his children or driving.

## B. Hearing on May 18, 2010

At the time of the hearing, plaintiff was a 41-year-old high school graduate. (Tr. 29). Plaintiff testified that he worked for his father's automotive body shop for approximately 12 years, but left in January 2009 because of pain from a back injury. During his employment, plaintiff engaged in repair work, including sanding, painting, and taking cars apart.  Plaintiff stated that he had not worked at the body shop since January 2009 and had not sought employment elsewhere because of his pain and panic attacks. (Tr. 29-30).

Plaintiff testified that his "anxiety level is there all of the time," that he suffers from "terrible" depression, and that the facet rhizotomy[4] procedure performed in 2007

---

[4] Facet rhizotomy is a percutaneous radiofrequency lysis of the innervation of a facet. Stedman's Med. Dict. 1032 (27th ed. 2000). This procedure interrupts nerve conduction to relieve joint pain in the spine. PainCare, available at http://www.painmd.com/treatments/other-treatments/191-radiofrequency-lesionin g-rfl.html (last visited October 19, 2012).

-3-

or 2008 was not beneficial in alleviating his pain. (Tr. 30-31). Plaintiff admitted to abusing opiates two or three years prior to the hearing, but had since undergone counseling in order to eliminate the problem. (Tr. 32).

Plaintiff claimed that he experiences panic attacks at least three times a week and sometimes every day. These attacks last anywhere from ten minutes to an hour. Plaintiff testified that subsequent to an attack he experiences anxiety and feels the need to isolate himself from others. (Tr. 33). Plaintiff further claimed that depression causes him to experience "crying spells" at least a couple of times a week and sometimes daily. (Tr. 33-34). These spells last approximately five to ten minutes. However, plaintiff denied experiencing suicidal or homicidal thoughts. (Tr. 34). Plaintiff indicated that he gets no more than two hours of sleep per night and has not slept through an entire night in the year or two preceding the date of the hearing. (Tr. 34).

Plaintiff further testified that at least once a month for a year he saw Manish Suthar, M.D, at the Pain Prevention and Rehab Center. In a four year span, plaintiff believed he had received approximately two dozen epidurals that provided pain relief for a maximum of four hours per each injection. Plaintiff claims that it is painful for him to sit for more than thirty minutes, stand for more than forty-five minutes, or reach above his shoulders or head. (Tr. 35-36). Plaintiff cannot drive for more than thirty or forty-five minutes without exiting the vehicle, lying down, and stretching.

Gerald D. Belchick, Ph.D., a vocational expert, provided testimony regarding employment opportunities for a 40-year-old hypothetical individual with 12 years of education, plaintiff's work experience, and who has the ability to lift and carry 20 pounds occasionally, 10 pounds frequently, who can stand or walk for six hours out of eight, sit for six, occasionally climb stairs and ramps, ropes ladders and scaffolds, and

who can occasionally stoop, kneel, crouch, and crawl. (Tr. 37). Dr. Belchick opined that such an individual would be able to perform light, unskilled work. As examples, Dr. Belchick opined that the hypothetical individual could work in an assembler position of which there are 2,300 jobs within the State of Missouri or a packaging position of which there are 2,100 jobs in the State of Missouri. (Tr. 38).

The ALJ then added to the hypothetical the ability to understand, remember and carry out simple instructions and non-detailed tasks, the need to be away from regular constant contact with the general public, and the ability to make simple work related decisions and take appropriate precautions to avoid hazards. Dr. Belchick testified that the hypothetical individual with these additional attributes would still be able to perform as an assembler or a packager. (Tr. 38).

Lastly, plaintiff's attorney asked whether panic attacks that occur at least three times a week and have the effect of preventing the hypothetical individual from interacting appropriately in a work-like setting during and after the attacks would eliminate the assembler and packager employment opportunities. The vocational expert answered in the affirmative. (Tr. 39).

### C. Medical Evidence

The relevant medical record reflects that from 2006 to 2010, plaintiff sought treatment from Meier Clinic for symptoms of depression, anxiety, and panic attacks. The record further reflects that from 2008 to 2010, plaintiff sought treatment for lower back pain from the Pain Prevention and Rehabilitation Center.

On October 24, 2006, Terry D. Guiley, M.D., performed a psychiatric evaluation of plaintiff at Meier Clinic. Treatment notes reflect that plaintiff encountered a severe onset of panic attacks approximately two months prior to the evaluation and suffered

-5-

from depression that seemed to be triggered from a divorce that occurred nine years earlier. (Tr. 245). On December 5, 2006, Dr. Guiley noted that plaintiff was doing better. However, on May 24, 2007, Dr. Guiley reported that in early May plaintiff slipped back into a depression followed by intense panic attacks and lack of sleep. Dr. Guiley prescribed Xanax[5] and Lexapro.[6] (Tr. 244). On May 29, 2007, Dr. Guiley indicated that the panic was under control, but anxiety persisted upon wakening. (Tr. 243).

On November 7, 2007, plaintiff voluntarily admitted himself to St. John's Mercy Medical Center for "major depression/substance dependence." (Tr. 224). However, plaintiff told the admitting physician, Eduardo L. Garcia-Ferrer, M.D., that "to be honest it was stupid, I talked suicide to get my wife to feel sorry for me" and that he felt hopeless "but not suicidal." (Tr. 216).

On November 13, 2007, plaintiff visited Dr. Guiley. Treatment notes indicate that plaintiff "cut Xanax because [he] felt it was making him 'down,'" that he wished he were dead but denied suicidal ideation, and that for a couple of weeks he stopped taking his pain medication.  Plaintiff told Dr. Guiley that his depression was severe because his wife had recently banned him from their shared residence and obtained a restraining order against him because she discovered that he "had done cocaine with friends one time recently." On November 29, 2007, plaintiff reported that his depression was still "intolerable," but that he rarely took his Xanax prescription. (Tr. 242). However, on

---

[5] Xanax is indicated for the treatment of panic disorder.  See Phys. Desk Ref. 2655-56 (60th ed. 2006).

[6] Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html (last visited on Nov. 7, 2012).

December 27, 2007, Dr. Guiley noted a "definite improvement" in depression, anxiety, concentration, sleep, and appetite. (Tr. 241).

On January 8, 2008, plaintiff saw Dr. Suthar at the Pain Prevention and Rehabilitation Center for medication refills. Office notes indicate that plaintiff had undergone a rhizotomy prior to the appointment and that plaintiff reported he was "beginning to feel significant relief of his pain," felt his pain was "continuing to improve from the procedure," and that there were more days when he took only two 5 mg of Percocet rather than the three allowed. Dr. Suthar indicated that plaintiff suffered from chronic left SI joint dysfunction. (Tr. 261). On February 7, 2008, plaintiff returned to Dr. Suthar and contradictorily stated that he "has still not begun to feel any benefit from the [rhizotomy]." (Tr. 260).

On February 26, 2008, plaintiff returned to Meier Clinic in which Dr. Guiley reported "some definite improvement in situation, mood, concentration," an absence of panic attacks, and the effectiveness of prescriptions. During the appointment, plaintiff stated the he had "not felt this good for as long as he [could] recall." (Tr. 241).

On March 10, 2008, plaintiff had a follow-up visit with Dr. Suthar. Office notes indicate that plaintiff seemed to be "doing reasonably well." Dr. Suther noted that plaintiff tended to struggle towards the end of the day, but was able to rest and recover with use of medicines. Dr. Suthar refilled the Percocet prescription and provided a trial of Lunesta to assist with sleep. However, on March 23, 2008, plaintiff went to the emergency department at Missouri Baptist Medical Center with complaints of back pain. Leonard D. Winer, M.D., the emergency physician, reported that plaintiff was tender in the paraspinal low left back muscles but had full range motion of the knee and hip. Dr.

Winer indicated a diagnosis of back pain and radiculitis[7] and prescribed Flexeril[8] and Prednisone.[9] (Tr. 269-281).

Plaintiff returned to Dr. Suthar on March 27, 2008 to discuss the hospital visit and indicated that he was experiencing an increased pain in his left lower back that radiated down to the posterior aspect of his left lower leg.  Plaintiff attributed the pain to his work at the auto body shop. Dr. Suthar noted that plaintiff stopped taking the Percocet a few days prior to the visit because plaintiff claimed it was not helping the pain. Dr. Suthar advised plaintiff to continue the Percocet twice daily. (Tr. 258).

On April 22, 2008, plaintiff returned to Meier Clinic with complaints of exacerbated depression and significant marital and financial stress. Dr. Guiley continued plaintiff on Lexapro, a retrial of Cymbalta,[10] Xanax, Adderall,[11] and a trial of Ativan. On May 1, 2008, plaintiff's mother called Dr. Guiley with concerns that plaintiff's depression, panic attacks, and insomnia were becoming worse. Dr. Guiley made adjustments to plaintiff's medication. (Tr. 240). On May 13, 2008, plaintiff informed Dr. Guiley that he had weaned himself off all medications except Adderall, that he no longer

---

[7] Disorder of the spinal nerve roots.  See Stedman's Med. Dict. 1503 (27th ed. 2000).

[8] Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions.  See Phys. Desk Ref. 1832-33 (60th ed. 2006).

[9] Prednisone is used to treat the symptoms of low corticosteroid levels. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000091/ (last visited Nov. 7, 2006).

[10] Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder; pain and tingling caused by diabetic neuropathy and fibromyalgia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html (last visited on Nov. 7, 2012).

[11] Adderall is used to control attention deficit hyperactivity disorder (ADHD). http://www.webmd.com/drugs/drug-63163-Adderall+Oral.aspx?drugid=63163&drugname=Adderall+Oral (last visited Oct. 29, 2012).

felt a sense of racing thoughts, did not suffer from any recent panic attacks, and had been sleeping well. Plaintiff further reported that his divorce was finalized which provided him with a sense of relief.  (Tr. 239). However, on May 22, 2008 Dr. Guiley readjusted plaintiff's medications due to plaintiff's reports of intense anxiety, sadness, and insomnia. (Tr. 238). On May 27, 2008, Dr. Guiley made another medication adjustment as plaintiff continued to suffer severe panic and increased depression from his joint pain. (Tr. 237).

On May 28, 2008, plaintiff returned to Dr. Suthar for a follow-up visit. Dr. Suthar noted that the lumbar radicular symptoms were consistent with an L5-S1 nerve root irritation. (Tr. 257). On June 24, 2008, plaintiff told Dr. Guiley that the Xanax prescription "help greatly" for the panic attacks. (Tr. 237). On June 26, 2008, plaintiff underwent a sacroiliac joint injection with corticosteroid at the Pain Prevention and Rehabilitation Center.[12] (Tr. 263).

On July 22, 2008, plaintiff returned to Meier Clinic and reported that he felt depressed, helpless, hopeless, and that nothing made him happy.  Dr. Guiley noted that these fluctuating moods tended to occur for about 3-4 days, but that the panic and anxiety were fairly well controlled. Plaintiff was instructed to increase Lexapro to 30mg on "bad days." (Tr. 236).

On July 24, 2008, plaintiff returned to Dr. Suthar who reported that plaintiff was "doing reasonably well" and that the  sacroiliac joint injection "settle[d] his pain down

---

[12]Sacroiliac joint injections provide relief from pain associated with sacroiliac joint dysfunction. Anti-inflammatory medication (corticosteroid) is included in the injection to provide pain relief by reducing inflammation within the joint. Spine-Health, http://www.spine-health.com/treatment/injections/sacroiliac-joint-injection (last visited October 25, 2012).

dramatically at least to the point that he was able to tolerate the reduction in his Percocet from 10 mg to 5 mg 3 times a day." (Tr. 256).

On September 16, 2008, plaintiff saw Dr. Guiley who noted that the "depression [was] definitely gone since Wellbutrin started," but "anxiety remain[ed] severe" although it did "not always proceed to full panic." Plaintiff also complained of difficulty sleeping. Dr. Guiley adjusted plaintiff's medications. (Tr. 235).

On September 17, 2008 plaintiff returned to the Pain Prevention and Rehabilitation Center for a follow-up visit. Dr. Suthar reported that plaintiff was doing reasonably well and that his pain seemed adequately controlled. (Tr. 255). On October 8 and November 4, 2008, plaintiff underwent prolotherapy sessions for the left SI joint dysfunction.[13] (Tr. 254, 252). On December 28, 2008, plaintiff received another sacroiliac joint injection with corticosteroid. (Tr. 262).

On December 29, 2008, plaintiff reported to Dr. Suthar that the combination of the therapy and cortisone injections helped the pain throughout December. (Tr. 253). On January 27, 2009, plaintiff underwent a third prolotherapy session. At the session, plaintiff expressed an interest in reducing his pain medication and Dr. Suthar provided him with specific instructions. (Tr. 251).

On February 19, 2009, plaintiff returned to Meier Clinic. Dr. Guiley indicated that he was "doing well except for sleep." (Tr. 320). On February 24, 2009, plaintiff underwent his fourth prolotherapy session. Plaintiff told Dr. Suthar that the "past month [was] the best month he has had," he was able to sleep, and had periods of complete pain relief. (Tr. 250). On March 19, 2009, plaintiff underwent his fifth prolotherapy

---

[13] See supra note 3.

-10-

session. He told Dr. Suthar that he continued to have another excellent month in pain control and that he was traveling to England that week. (Tr. 249). On March 31, 2009, plaintiff returned to Meier Clinic reporting that his panic was worsening. Dr. Guiley noted that "anxiety seems to be in response to situations in which he must be responsible." (Tr. 320).

On April 20, 2009, plaintiff reported to Dr. Suthar that he was doing very well overall, that he believed the prolotherapy was helping greatly, and expressed his desire to skip a month of the prolotherapy and cut back on his narcotic pains medications. (Tr. 248). On May 19, 2009, plaintiff stated that he was experiencing a little more pain and discomfort and attributed these symptoms to skipping a month of treatment. During the office visit, plaintiff underwent his sixth prolotherapy session. (Tr. 334).

On May 28, 2009, plaintiff returned to Meier Clinic and stated that he felt better, was more calm, and had less panic. Dr. Guiley observed and noted that plaintiff was more relaxed and not sad or anxious. (Tr. 319).

On July 13, 2009, plaintiff underwent a psychiatric/psychological exam at West Park Medical Clinic, for which John S. Rabun, M.D., provided a report. The report reflects that plaintiff told Dr. Rabun that he suffers from regular panic attacks that can occur several times per week, but that he was doing "pretty good" in regards to his depression. Dr. Rabun observed plaintiff as pleasant, cooperative, able to concentrate on specific tasks with logical thought, fully alert and oriented, of average intelligence, and without any current symptoms of depression. Dr. Rabun diagnosed plaintiff with panic disorder, major depressive disorder in full remission, sacroiliac injury, and chronic

-11-

pain with a GAF of 50.[14] Dr. Rabun reported that plaintiff "would have significant difficulty focusing, concentrating, and remembering instructions, especially during and after a panic attack" and that he would be "completely unable to interact appropriately in a work-like setting during and after a panic attack." (Tr. 291-293).

On July 16, 2009, plaintiff underwent his eighth prolotherapy session. Plaintiff reported that he suffered some pain and discomfort in the past month, which he attributed to having to work six days a week. Dr. Suthar noted that plaintiff "seemed from a psychological standpoint to be managing his symptoms fairly well." (Tr. 333). On July 30, 2009, plaintiff returned to the Pain Prevention and Rehabilitation Center due to a severe bout of SI joint pain. Dr. Suthar noted that plaintiff had a significant displacement of the left SI joint, adjusted his medications accordingly, and referred plaintiff to a physical therapist.[15] (Tr. 332).

On August 13, 2009, plaintiff returned to Dr. Suthar for a one-month follow up. Office notes indicate that plaintiff was not pain-free but was "remarkably better" and that the physical therapy treatment had "reduced the dysfunction in his SI joint." Dr. Suthar  recommended that plaintiff see the physical therapist on an as-needed basis, that it would not be unreasonable to assume that plaintiff would have more displacements in the future  due to plaintiff's line of work, and that the prolotherapy sessions should be temporarily discontinued.  (Tr. 331).

_____

[14] A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning."   American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[15] The record does not include any reports of the physical therapist.

On August 14, 2009, Robert Cottone, Ph.D., performed a psychiatric review of plaintiff who reported that plaintiff's anxiety-related impairments were not severe. The report indicated that plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. Dr. Cottone specifically indicated that although panic was described as intense and enduring, plaintiff was not agoraphobic and his function was nearly normal and minimally impaired. (Tr. 294-305).

On September 9, 2009, plaintiff returned to Dr. Suthar. Plaintiff reported that he continued to work with the physical therapist and could feel improvement each day. He indicated that he was definitely better than he was the prior month and was interested in decreasing his medication. (Tr. 330). On October 9, 2009, plaintiff reported to Dr. Suthar that overall he was doing very well and that his pain seemed "to be at a steady state." (Tr. 329). On November 6, 2009, plaintiff told Dr. Suthar that his pain increased "slightly" and requested another SI joint injection (Tr. 328). On December 4, 2009, plaintiff indicated to Dr. Suthar that he was doing reasonably well. (Tr. 327). On December 30, 2009, Dr. Suthar noted that plaintiff was "stable" and that his "pain [was] well controlled with his medication." (Tr. 326).

On January 12, 2010, plaintiff returned to Meier Clinic after eight months. Plaintiff told Dr. Guiley that the Paxil prescription had "done wonders." Treatment notes show that plaintiff had not suffered a panic attack in "months" with "no return of depressive" symptoms and no racing thoughts. (Tr. 319).

-13-

On January 25, 2010, plaintiff saw Dr. Suthar for a follow-up appointment and stated that he was going to the Super Bowl in Florida. Dr. Suthar found that plaintiff's back had "been managing well." (Tr. 325). On February 22, 2010, plaintiff again reported to Dr. Suthar that he was doing well. Plaintiff stated that he had had an "episode" the prior week, but that it subsided after doing his exercises and stretches. Dr. Suthar noted that plaintiff was eager to try to reduce or eliminate his medication. Dr. Suthar encouraged plaintiff to reduce his medicine by one-half pill a week. (Tr. 324). On August 31, 2010, plaintiff saw Dr. Suthar for another follow-up appointment. Office notes indicate that plaintiff was doing about the same. Dr. Suthar reported that plaintiff was more stable than he had been in years despite the impact that weather changes can have on plaintiff's symptoms. (Tr. 323).

### D. Evidence Submitted to Appeals Counsel

In conjunction with his request for review, plaintiff submitted a Mental RFC Assessment to the Appeals Council that was completed by Dr. Guiley on August 31, 2010. (Tr. 335-343); see Tr. 1-2 (acknowledgment by Appeals Council).

Dr. Guiley identified plaintiff's diagnosis as panic disorder with agoraphobia and chronic pain with a current GAF of 40.[16] Dr. Guiley described plaintiff's response to treatment as "fair" with periods of remission. Dr. Guiley wrote that plaintiff's medications--Xanax XR and Remeron--could cause fatigue, drowsiness, cognitive slowing, rebound symptoms when the medications wear off, and/or desensitization which

---

[16] A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

would require higher doses of medication.  Dr. Guiley described plaintiff as alert and oriented with good eye contact, coherent speech, and goal-directed thoughts. Dr. Guiley noted that plaintiff did not have suicidal or homicidal impulses, but that he had a depressed mood. (Tr. 337).

The assessment form required Dr. Guiley to identify plaintiff's signs and symptoms.  Dr. Guiley checked off the following: anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, psychomotor agitation, persistent disturbances of mood or affect, apprehensive expectation, emotional withdrawal or isolation, autonomic hyperactivity, sleep disturbance, and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week. (Tr. 338).

In terms of abilities, Dr. Guiley opined that plaintiff was limited but satisfactory in understanding, remembering, and carrying out very short and simple instructions, remembering work-like procedures, sustaining an ordinary routine without special supervision, responding appropriately to criticism from supervisors and changes in a routine work setting, awareness of normal hazards, setting realistic goals or making plans independently of others, and maintaining socially appropriate behavior. Dr. Guiley indicated that plaintiff was seriously limited but not precluded from maintaining attention for two hour segments, maintaining regular attendance and being punctual, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, getting along with co-workers or peers, dealing with normal work

-15-

stress, carrying out detailed instructions, dealing with stress of work, interacting appropriately with the general public, and traveling in unfamiliar places. Dr. Guiley reported that plaintiff was unable to meet competitive standards in completing a normal workday or workweek without interruptions from psychologically based symptoms and in performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 339-340).

Dr. Guiley further indicated that, on the average, he would anticipate that plaintiff's impairments or treatment would cause him to be absent from work about three days per month. (Tr. 341).

### III.  The ALJ's Decision

In the decision issued on July 30, 2010, the ALJ made the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2013.

2.  Plaintiff has not engaged in substantial gainful activity since January 23, 2009, the alleged onset date.

3.  Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine, major depressive disorder, and a panic disorder.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). He can lift/carry 20 pounds occasionally, ten pounds frequently, he can stand/walk six hours out of eight and sit for six hours out of eight, he can occasionally stoop, kneel, crouch or crawl, he can understand, remember, and carry out simple instructions and non-detailed tasks, he can make simple work-related decisions, he can take appropriate precautions to avoid hazards, and he should not work in regular/constant contact with the general public.

6.  Plaintiff is unable to perform any past relevant work.

-16-

7. Plaintiff was born on September 9, 1968 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. Plaintiff has at least a high school education and is able to communicate in English.

9. Transferability of job skills in not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the plaintiff is "not disabled," whether or not the plaintiff has transferable job skills.

10. Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform.

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from January 23, 2009, through the date of this decision.

(Tr. 10-25).

## IV. Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

-17-

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others,

-18-

and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to

his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

### V. Discussion

Plaintiff contends that (1) the ALJ's decision is not supported by substantial evidence because the ALJ failed to point to some medical evidence to support the RFC determination; (2) the Appeals Council did not provide a substantial evidentiary basis for disregarding the new evidence submitted; and (3) because the RFC was not appropriately determined, the hypothetical question presented to the vocational expert was flawed, and as such, the expert's testimony cannot be relied on by the ALJ.

#### A. Residual Functional Capacity Determination

The ALJ determined that plaintiff has the RFC to perform light work in that he can lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk 6 hours out of 8 and sit for 6 hours out of 8. He can occasionally climb ladders, ropes, scaffolds, ramps or stairs, can occasionally stoop, kneel, crouch or crawl, can understand, remember, and carry out simply instructions and non-detailed talks, can make simple work-related decisions, can take appropriate precautions to avoid hazards,

-20-

but should not work in regular/constant contact with the general public. In making his decision, the ALJ accorded little weight to the medical opinion of Dr. Ruban (Tr. 19).

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted); 20 C.F.R. § 404.1545(a)(1). It is the claimant's burden, rather than the Commissioner's to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). However, even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)); see also Dykes v. Apfel, 223 F.3d 665, 666 (8th Cir. 2000) (RFC is a determination based on all the record evidence, not only the medical evidence).

The Court finds that the ALJ's decision is supported by some medical evidence. The ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (citations omitted). See also Wheeler v. Apfel, 224 F.3d 891, 895 n 3 (8th Cir. 2000) ("That the ALJ did not attempt to describe the entirety of [claimant's] medical history does not support the [claimant's] argument that the ALJ disregarded certain aspects of the record."). The ALJ expressly acknowledged that the "medical evidence shows that the claimant has a history of treatment for back

pain, panic disorder, and depression." (Tr. 15). Additionally, the ALJ's decision included several references to medical records authored by plaintiff's treating physicians from both Meier Clinic and the Pain Management and Rehabilitation Center.

The ALJ specifically noted that one of plaintiff's treating physicians observed plaintiff to be "more relaxed and not sad or anxious" and that plaintiff had reported that the Paxil prescription "had done wonders" for his condition. (Tr. 16, 18). The ALJ referenced plaintiff's statements to Dr. Guiley that he had not had any panic attacks for months and that there was no return of depressive symptoms. (Tr. 16, 18). The ALJ further acknowledged plaintiff's sacroiliac dysfunction and L5-S1 nerve root irritation along with 2009 and 2010 treatment notes reflecting plaintiff's increasing improvement with pain management and therapy. (Tr. 15, 18-19).

The Court further finds that the ALJ's RFC determination could reasonably be drawn from the medical evidence and the record as a whole. The Eighth Circuit has held that "[i]t is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations. Persall v. Massanari, 274 F.3d 122, 1217 (8th Cir. 2001). The plaintiff does not contest the ALJ's determination of plaintiff's credibility, but does argue that the ALJ inappropriately gave little weight to Dr. Rabun's observations that were documented in a July 13, 2009 report.

The ALJ is entitled to dismiss or disregard evidence that he feels is inconsistent with other evidence. Kelley v. Callahan, 133 F.3d 583 (8th Cir. 1998). A treating physician's opinion is generally given deference over those of consulting physicians. Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930

-22-

F.2d 19, 21 (8th Cir.1991); See also Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.").

In making his decision to accord little weight to Dr. Rabun, a non-treating physician, the ALJ referred to the February 2009, March 2009, April 2009, December 2009, and January 2010 medical treatment notes in the record to conclude that the plaintiff's "panic attacks are well controlled on medication and occur infrequently." After review of the medical record, the Court finds that the treatment notes made prior to Dr. Rabun's consultative examination do not reflect a significant limitation or restriction on plaintiff's ability to work, debilitating pain or distress, or panic attacks that occur several times a week. In fact, Dr. Rubun's opinion is the first and only indication in the medical record of any significant limitation or restriction on plaintiff's ability to work.

Specifically on March 22, 2010, Dr. Suthar, a treating physcian, indicated that plaintiff's symptoms were more stable than they had been in years. Also on March 22, 2010, plaintiff expressed interest in discontinuing his pain medications and stated that exercising and stretching eased his pain. On January 25, 2010 plaintiff reported that he was well enough to travel to Florida to go to the Super Bowl, and on January 12, 2010, plaintiff returned after an eight-month hiatus from the Meier clinic in order to report that the Paxil had "done wonders," that *he had no panic attacks for months, and no return of depressive symptoms.* Twice in the month of December 2009 plaintiff reported that he was doing reasonably well and that his pain was well-controlled by his medication. (Tr. 319, 223-330). This evidence is consistent with the ALJ's finding that plaintiff retained the RFC to perform light work.

### B. New Evidence before the Appeals Council

Plaintiff submitted to the Appeals Council a "mental residual functional capacity questionnaire" completed on August 31, 2010 by one of plaintiff's treating physicians, Dr. Guiley. (Tr. 337-342). The Appeals Council stated that it considered the additional evidence and determined that this additional evidence was inconsistent with the record as a whole. (Tr. 1-2). Plaintiff asserts that the Appeals Council "did not provide a substantial evidentiary basis for discarding the opinion of the treating physician."

The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. 20 C.F.R. § 404.970(b); Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000). The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record. Id. This Court does not review the Appeals Council's denial but determines whether the record as a whole, including the new evidence, supports the ALJ's determination. Id.

Generally, a treating physician's opinion is given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" on the record or not inconsistent with the overall assessment of that particular physician. Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) (quoting C.F.R. § 404.1526(d)(2)).

In the questionnaire, Dr. Guiley reported that plaintiff was unable to meet competitive standards in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and his ability to perform at a

-24-

consistent pace without an unreasonable number and length of rest periods. Dr. Guiley also noted that plaintiff would be likely to miss about three days of work per month.

After review of the record, the Court finds that Dr. Guiley's report is inconsistent with his own treatment notes and the record as a whole for the relevant time period. Nowhere in Dr. Guiley's treatment notes does he mention that plaintiff was subject to any specific limitations. Instead, as discussed earlier, Dr. Guiley had previously reported a vast improvement in plaintiff's mental state, level of depression, and frequency of panic attacks, as well as a report from plaintiff that his medication had been "doing wonders." See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (impairments that can be controlled through medication are not disabling). Although Dr. Guiley did note on the questionnaire that plaintiff "has had periods of remission," Dr. Guiley did not indicate whether these "periods" occurred within the relevant time period being evaluated by the Court. See Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) ([V]ague, conclusory statements" do require great weight, even if made by treating physicians); Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008) (the new evidence must relate to the time period for which benefits were denied).

Additionally the questionnaire simply required Dr. Guiley to check a box for the majority of his opinions, which further decreases the weight of this new evidence. Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("[T]he checklist format, generality and incompleteness of the assessments limit their evidentiary value.").

Accordingly, the Court finds that the record as a whole, including the new evidence, supports the ALJ's initial determination.

## C.     Vocational Expert's Response to Hypothetical

In the final step of the disability analysis, the ALJ correctly relied upon the testimony of Dr. Belchick, the vocational expert , in determining that, while plaintiff could not perform his past work, he would be able to perform other available gainful activity. "Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007). The hypothetical posed to the expert accurately reflected the RFC found by the ALJ, which was supported by substantial evidence.  Dr. Belchick testified that such an individual would not be precluded from packager and assembler jobs that exist in the national and local economy. This expert testimony constitued substantial evidence upon which to base a denial of benefits.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

IT IS HEREBY ORDERED the relief sought by plaintiff in his complaint and his brief in support of the complaint is denied.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of January, 2013.

-26-